**WATERSHED ASSOCIATES RESCUE, Plaintiff,**

v.

**Clifford L. ALEXANDER (Secretary of the Army), Colonel Vito D. Stipo (substituted as defendant for Colonel James W. Ray, District Engineer, Omaha District, United States Army Corps of Engineers), and Papio Natural Resources District, Defendants.**

**No. Civ. 78–L–188.**

United States District Court, D. Nebraska.

Dec. 22, 1982.

William E. Holland, Omaha, Neb., for plaintiff.

David A. Kubichek, Ass't., U.S. Atty., Omaha, Neb., for the government.

Paul F. Peters, Omaha, Neb., for Papio Natural Resources Dist.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This action involves a challenge to the Army Corps of Engineers construction of a proposed 4.5 mile long levee on the west bank of the Missouri River, immediately south of Bellevue, Nebraska, to be constructed as Unit R–616 of the Missouri River Levee System. Plaintiff, Watershed Associates Rescue (WAR) is an unincorporated association of landowners, lessees and other persons interested in and affected by the proposed levee. Most of the members of WAR live on property between the Missouri River and the proposed alignment of Unit R–616. The members of WAR use the area to be affected by Unit R–616 for outdoor recreation (including boating, fishing, hunting and study of wildlife) as well as for residential and business purposes, and allege that their use of this area will be adversely affected by Unit R–616. Defendant Clifford L. Alexander, Jr., is the Secretary of the Army. Defendant Colonel Vito D. Stipo, substituted as defendant for Colonel James W. Ray, is the District Engineer, Omaha District, United States Army Corps of Engineers (the Corps). Defendant Papio Natural Resources District (PNRD) is a political subdivision of the State of Nebraska, organized and existing pursuant to the authority of Neb.Rev.Stat. §§ 2–3201 *et seq.* (Reissue 1977).

Plaintiff's complaint states four separate claims for relief. Claim 1 alleges that the Final Environmental Impact Statement (FES) prepared on Unit R–616 violates the requirements of the National Environmen-

tal Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* (1976) and the regulations promulgated thereunder. In Claim 2 plaintiffs allege that defendants have violated the NEPA by failing to prepare a programmatic environmental impact statement covering the entire Missouri River Levee System before considering construction of Unit R–616. Plaintiffs allege in Claim 3 that the issuance of a "404 permit" authorizing defendant Papio Natural Resources District to discharge dredged or fill material into wetlands in conjunction with preservation and maintenance of Unit R–616 violated NEPA and federal regulations promulgated thereunder. Finally, plaintiffs claim that the defendants have violated Executive Order 11988-Flood Plain Management, and the guidelines for implementing E.O. 11988 promulgated by the Water Resources Council at 43 Fed.Reg. 6030 on February 10, 1978.

This action was tried to the Court without a jury, and at the request of the parties, the Court also conducted a view of the proposed site of R–616 and the surrounding environment. All parties subsequently filed post-trial briefs setting forth their respective positions. However, at trial, the parties narrowed the issues before the Court to five:

1) Whether the plaintiff's action is barred by laches;

2) Whether the defendants are required to take further action to comply with Executive Order 11988 before construction of the Unit R–616;

3) Whether a programmatic environmental impact statement must be prepared covering the entire Missouri River Levee System before construction of Unit R–616;

4) Whether the FES, the Supplement to the FES, and the Supplemental Information Report (SIR) adequately describe the impact of Unit R–616 on fish and wildlife and their habitat;

5) Whether the Supplement to the FES and/or the SIR prepared by the Corps were required to be circulated for agency and public comment.

The Court has jurisdiction of this action under 28 U.S.C. § 1331. This memorandum opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 wherein the Court has concluded that the complaint must be dismissed and the construction in question be allowed to proceed.

## FACTUAL BACKGROUND

Construction of the Missouri River Levee System was authorized by the Flood Control Act of 1944 (Public Law 534, 78th Cong., 2d Sess.). The authorized purpose of the project was to provide protection against major floods. Since authorization, the need for and the feasibility of the separate levee units in the system have been re-evaluated on several occasions. A report, Missouri River Levee System, Analysis of Levee Units L–611–614 and R–616, was prepared and forwarded to the Secretary of the Army by the Missouri River Division in February, 1972. After approval of the report by the Secretary of the Army, Levee Units L–611–614 and R–616 were reclassified to the active category on November 26, 1973. Unit R–616 will be located in Sarpy County, Nebraska, along the right (west) bank of the Missouri River between river miles 596.6 and 601.4. Unit R–616 will be aligned to provide a minimum three thousand foot flood way between it and its companion levee, Unit L–611–614, located on the left bank of the Missouri River in Mills and Pottawattamie Counties, Iowa, between river miles 588 and 605.7, approximately opposite Unit R–616. At the time of trial, construction of Unit L–611–614 was substantially completed.

Unit R–616 will provide protection to 3,950 acres of Missouri River flood plain. The land intended to be protected by R–616 is presently used primarily for crop production. After construction of Unit R–616, industry is expected to gradually move into the flood plain.

On February 7, 1974, the Papio Natural Resources District assumed local sponsorship of the Unit R–616 project and agreed to provide local cooperation, including pro-

vision without cost to the United States of all lands, easements and rights-of-way necessary for construction of the project and to maintain and operate all the works after completion of construction.

On July 24, 1974, the PNRD held an informational meeting on R–616. On February 25, 1975, the Corps itself held a public meeting on the proposed construction at the Bellevue City Hall in Bellevue, Nebraska. That meeting was attended by at least twenty individuals who later became members of the plaintiff organization WAR. At said meeting, interested persons were given an opportunity to publicly express their views on the proposed project and copies of the draft environmental impact statement for Unit R–616 were made available to the public and comments were solicited. On February 28, 1975, the draft environmental impact statement was filed with the Council on Environmental Equality.

A subsequent public meeting was held by the public sponsor, the PNRD, on April 3, 1975, at its offices in Omaha, Nebraska. At least twenty-three persons who later became members of WAR were in attendance at that meeting, including Margaret Barkdoll and Sarah Camden, who were elected the secretary and treasurer respectively of WAR at its formation.

WAR was formed on April 20, 1975, with the purpose of preventing the Unit R–616 levee from being built. In April and May of 1975, WAR members launched a letter writing campaign in an attempt to persuade United States Congressmen and Senators to vote against appropriation of funds for the R–616 project. However, from the period of May, 1975 to March, 1978, WAR did not engage in any specific activities in opposition to the R–616 project with the exception of internal meetings of the members and some limited correspondence. On February 27, 1976, the Phase II General Design Memorandum for R–616 was forwarded for review and approval to the Corps Division Engineer of the Missouri River Division. This document was made available for public review. On April 12, 1976, the Phase II General Design Memorandum was approved. The FES for R–616 was filed with the Council on Environmental Quality on May 21, 1976, and on that date notice was published in the Federal Register of the filing of the FES. On May 28, 1976, copies of the FES for R–616 were mailed by the Corps to all who had responded to the draft environmental impact statement and other interested parties who had requested copies. Four members of WAR were included in this mailing which included a cover letter requesting comments by June 28, 1978. The WAR organization did not provide written comments to the Corps on the FES during the comment period or thereafter.

On March 10, 1977, the Papio NRD Board approved a formal agreement with the Corps for sponsorship of R–616, and on May 25, 1977, entered an agreement to provide without cost to the United States all lands, easements and rights-of-way necessary for construction of the Missouri River Levee System Unit R–616 in Sarpy County. On March 28, 1977, representatives of PNRD presented testimony before Congressional committees on R–616 appropriations.

A regular meeting of the PNRD Board was held on April 7, 1977, which was attended by twelve members of the WAR organization. At that meeting, a report was made to the Board on the presentation of testimony at hearings before the Senate and House subcommittees for appropriations and there was a discussion regarding that testimony. WAR members Harry Sorensen and Eva Bennock addressed the Board concerning their opposition to the R–616 project.

Funds for construction of the R–616 project were appropriated through fiscal year 1978 by the Public Works for Water and Power Development and Energy Research Appropriation Act of 1978, Public Law 95–96, approved August 7, 1977. Immediately thereafter, the Corps informed the PNRD Board by letter that they had received the necessary funding for construction of Unit R–616 and requested

PNRD to obtain right-of-way for the project. Letters were sent to affected landowners of the proposed land acquisition and a public hearing was held on the land rights acquisition on November 17, 1977. Members of WAR attended that public meeting.

On January 5 and 16, 1978, the Board considered appraisal reports on the R–616 project and authorized PNRD to transmit offers of damages to the property owners affected. Negotiations with the landowners then began. On April 6, 1978, having been unsuccessful in acquiring by negotiation the land necessary for the project right-of-way, the PNRD Board authorized the District to institute eminent domain proceedings against several interests in property.

A regular meeting of the PNRD Board was held on June 8, 1978, at which a status report on the R–616 project was given. It was noted at that meeting that eminent domain proceedings had been filed on six of nine parcels of land involved in land acquisition for the project and that the county court hearings in these proceedings would be held on June 26, 1978. WAR members Sarah Camden, Eva Bennock and Harry Sorensen addressed the Board on the R–616 project.

On June 28, 1978, the Corps readvertised bids for the construction of R–616. Another meeting of the PNRD Board was held on July 6, 1978, at which WAR member Sarah Camden requested the Board to reconsider cooperation with the Corps on the R–616 project. On July 29, 1978, a public meeting was held in Bellevue at the instance of State Senator Frank Lewis, at which Corps representatives responded to six questions on R–616 submitted by WAR through Senator Lewis.

On August 18, 1978, the PNRD deposited the amount of the eminent domain awards in county court. On August 23, 1978, the Corps opened bids for construction of R–616 and received a low bid of $1,487,739.05 from Ed Miller and Sons of Omaha. WAR filed the present action on August 25, 1978.

## LACHES

■ The defendants claim that WAR's action is barred by the doctrine of laches. As the Eighth Circuit has noted, while this doctrine is available, it has received a lukewarm reception in environmental litigation, "for not only will others than the plaintiff suffer the possible adverse environmental effects, but the agency will escape compliance with NEPA, a result not to be encouraged." *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1324–25 (8th Cir.1974). *See Save Our Wetlands v. United States Army Corps of Engineers*, 549 F.2d 1021, 1026 (5th Cir.) *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Lathan v. Volpe*, 455 F.2d 1111 (9th Cir.1971); *Sierra Club v. Cavanaugh*, 447 F.Supp. 427, 429 (D.S.D. 1978).

■ There are three criteria which must be met before laches can be applied. The defendants must show: (1) a delay in asserting the right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the defendants as a result of the delay. *Save Our Wetlands, supra*, 549 F.2d at 1026; *Sierra Club v. Cavanaugh, supra*, 447 F.Supp. at 429; *Nolop v. Volpe*, 333 F.Supp. 1364, 1367 (D.S.D.1971).

■ The question whether laches bars an action depends upon the facts and circumstances of each particular case. *Lathan v. Brinegar*, 506 F.2d 677, 692 (9th Cir.1974). In determining whether there has been inexcusable delay, the factors to be considered include (1) whether the party has made an attempt to make its position known to the agency before the filing of a suit; (2) the agency response to the request; and (3) developments such as preparatory construction that tend to motivate citizens to investigate the legal basis for challenging the agency action. *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980). *See Cady v. Morton*, 527 F.2d 786, 792 (9th Cir.1975); *City of Davis v. Coleman*, 521 F.2d 661,

673 (9th Cir.1975); *Steubing v. Brinegar,* 511 F.2d 489, 495 (2d Cir.1975).

■ In determining whether delay is prejudicial, a pertinent inquiry is whether substantial work on the project has been completed before suit was brought. *Coalition for Canyon Preservation v. Bowers, supra,* 632 F.2d 779; *Save Our Wetlands, Inc. v. United States Army Corps of Engineers, supra,* 549 F.2d at 1027–28. The number of dollars spent or the percentage of project completion is significant primarily to indicate if it would be difficult to alter the basic plan. If the difficulty is substantial, compliance with federal environmental policy acts may not result in any major changes or environmental benefits. *Coalition for Canyon Preservation v. Bowers, supra,* 632 F.2d at 780. *See Save Our Wetlands, Inc. v. United States Army Corps of Engineers, supra,* 549 F.2d at 1028; *City of Rochester v. United States Postal Service,* 541 F.2d 967, 977 (2d Cir. 1976); *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860, 868–69 (5th Cir. 1975). The increase in costs due to delay is not a factor to be considered since NEPA by its very nature contemplates such delay. *Coalition for Canyon Preservation v. Bowers, supra,* 632 F.2d at 780. The primary question is not how much earlier the plaintiff should have sued, but whether injunctive relief pending compliance would still serve the public interest and the purposes of the Act. *Steubing v. Brinegar, supra,* 511 F.2d at 495.

■ Defendants appear to urge that the Court should measure the three-year delay from the time of the filing of the final FES with the CEQ in January 1976, to the date of the filing of this suit in August, 1978. Plaintiff attributes the delay in commencement of the suit to the reliance on a letter from Senator Roman Hruska dated May 5, 1975, in which the Senator informed WAR that the Corps had not asked Congress for money to construct the levee during the upcoming fiscal year and that he had been advised that additional studies would be necessary before any work could begin. Plaintiff also urges that this delay was

excusable because during this period of time WAR was attempting to stop the Unit R–616 project through other public forums besides litigation. Under the facts and circumstances of this case, the Court declines to find that there has been inexcusable delay in filing this suit. In applying the considerations articulated in *Lathan v. Brinegar, supra,* to the facts of this case, the Court finds that WAR made a concerted attempt to make its opposition to Unit R–616 known to both the Corps and especially the PNRD Board before the filing of this suit. Members of WAR appeared at several meetings of the PNRD Board to speak in opposition to the project, and as late as July 29, 1978, at the instance of State Senator Frank Lewis, the Corps representatives responded to WAR's opposition to R–616. Plaintiffs could have reasonably believed that the opportunity still existed to influence the decisionmakers regarding the proposed construction of R–616.

Moreover, there was no preparatory construction on the project site which would tend to alert WAR members of the fact that a final decision had been reached to proceed with construction of R–616. The commencement of condemnation proceedings by PNRD did not occur until April-May of 1978. It was not completed until August 18, 1978. The Corps itself did not open bids for construction of R–616 until August 23, 1978, and this action was brought immediately thereafter. The Court does not find that delay from April-May of 1978, when eminent domain proceedings were commenced, until August, 1978, when the suit was filed, constitutes an inexcusable delay of the type warranting a finding of laches in a suit brought to enforce the NEPA.

Nor can the Court find "prejudice" as that term has been used in environmental litigation. As noted above, the pertinent inquiry is whether substantial work on the project has been completed before suit is brought. Here, the PNRD had completed right-of-way acquisition at a cost to it of over one million dollars before suit was

filed, but no physical construction had begun. This is not the situation where an "irreversible commitment of resources has already produced most of the environmental harm which an EIS would have anticipated," *Shiffler v. Schlesinger*, 548 F.2d 96, 104 (3d Cir.1977). The number of dollars spent by the PNRD to acquire right-of-way, standing alone, simply cannot be determinative. The fact remains that in the absence of preparatory construction, it would not be difficult to alter the basic plan should the Court find plaintiff's challenges to the construction of the proposed project meritorious. Expenditures of sums greatly in excess of that spent here by the PNRD have been found insufficient to warrant a finding of prejudice in a number of cases where construction had not yet progressed to the point where significant environmental damage had been done. *See, e.g., Steabing v. Brinegar, supra*, 511 F.2d at 495; *Ecology Center of Louisiana, Inc. v. Coleman, supra*, 515 F.2d at 869; and *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1329 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

Accordingly, the Court having found neither inexcusable delay on the part of the plaintiff nor prejudice, the Court finds the defendants' laches defense to be without merit.

### COMPLIANCE WITH EXECUTIVE ORDER 11988

Executive Order 11988, entitled "Flood Plain Management," seeks to minimize actions by federal agencies which may adversely affect flood plains. The order was issued by the President of the United States on May 24, 1977. The EO directs federal agencies to evaluate the effects of proposed action on flood plains and to avoid taking action affecting such areas unless there are no "practical alternatives." It also requires agencies to provide an opportunity to the public and interested agencies to comment on proposed projects. The Corps issued proposed regulations to implement EO 11988 on May 19, 1978. *See* 43 Fed.Reg. 22307, *et seq.* The Corps adopted

final regulations on May 15, 1979. *See* 44 Fed.Reg. 28524, *et seq.*, now published at 33 C.F.R. Pt. 240.

The final regulations promulgated by the Corps list the "general procedures" to be followed for implementing EO 11988. The decision maker is to (a) determine if the proposed action is in the base flood plain; (b) if the action is in the base flood plain, identify and evaluate practical alternatives to the action or to the location of the action in the base flood plain; (c) if the action must be in the flood plain, advise the general public in the affected area and obtain their general views and comments; (d) identify beneficial and adverse impacts due to the action and any expected losses of natural and beneficial flood plain values; (e) if the action is likely to induce development in the base flood plain, determine whether a practical non-flood plain alternative for the development is available; (f) as part of the multi-objective planning approach, determine viable methods to minimize any adverse impacts of the action; (g) if the final determination is made that no practicable alternative exists to locating the action in the flood plain, advise the general public in the affected area of the findings; and (h) recommend the plan most responsive to the planning objectives established by the study and consistent with the requirements of the Executive Order.

It is uncontroverted that Unit R–616 is proposed to be constructed in the "flood plain" of the Missouri River within the meaning of Executive Order 11988, and that construction of Unit R–616 is an action by an agency within a "base flood plain" within the meaning of that EO and the Water Resources Council Flood Plain Management Guidelines for Implementing Executive Order 11988, published February 10, 1978. *See* 43 Fed.Reg. 6030. It is also uncontroverted that the Corps has made no evaluation of the impacts of Unit R–616 on lives and property within the flood plain or on natural and beneficial flood plain values, for the specific purpose of complying with EO 11988.

Plaintiffs allege that EO 11988 was violated by the Corps in that construction of Unit R–616 will result in indirect or direct support of flood plain development, and the Corps has failed to consider alternatives, has failed to make a finding that no other practicable alternative consistent with the policy of the EO exists, and has failed to evaluate the impact of R–616 on lives and property and on . natural and beneficial flood plain values. The defendants on the other hand contend that the Executive Order is a Presidential "managerial tool" and was not intended to be judicially enforceable by private parties. Defendants also argue that, assuming such a right of action exists, to the extent EO 11988 and the implementing regulations applied to Project R–616, the regulatory requirements have been specifically identified and fairly addressed.

■ The threshold issue before the Court is whether EO 11988 is judicially enforceable at the behest of the plaintiff. This Circuit has held that in order for an executive order to be judicially enforceable, it must have the force and effect of law and it must create a private cause of action. *Independent Meat Packers Association v. Butz,* 526 F.2d 228, 243–36 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). *See also Gnotta v. United States,* 415 F.2d 1271 (8th Cir.1969), *cert. denied,* 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970); *Acevedo v. Nassau County,* 500 F.2d 1078 (2d Cir.1974); *Farkas v. Texas Instrument, Inc.,* 375 F.2d 629 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3 (3d Cir.1964). For an executive order to have the force and effect of law, it must be issued "pursuant to a statutory mandate or delegation of authority from Congress." *Independent Meat Packers Association v. Butz, supra,* 526 F.2d at 234. The President may not act as a lawmaker in the absence of a delegation of authority or mandate from Congress. *Youngstown Sheet and Tube Company v. Sawyer,* 343 U.S. 579, 587–89, 72 S.Ct. 863, 866–67, 96 L.Ed. 1153 (1952).

■ Executive Order 11988 states in its preamble that its authority stems from the "Constitution and statutes of the United States of America," and "in furtherance of" the NEPA, the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.,* and the Flood Disaster Protection Act of 1973, Public Law 93–234, 87 Stat. 975. There is no specific citation in the order to pin down this grant of authority. Perusal of the statutes cited reveals the absence of any directive to the President to issue executive orders having the force and effect of law. In the absence of a clear statutory mandate or delegation of authority from Congress to the President to promulgate regulations in furtherance of the statutes cited, and in light of the clear authority in this Circuit regarding judicial enforceability of executive orders, this Court declines to review the actions of the defendants under Executive Order 11988.

Even assuming arguendo that Executive Order 11988 has the force and effect of law, this Court would not be inclined to find that Executive Order 11988 was intended to create a private right of action. The EO does not expressly grant such right, but instead by its express terms provides only for a reporting requirement by each federal agency to the Counil on Environmental Quality and the Water Resources Council, and for a periodic evaluation of agency procedures under the EO and their effectiveness by the Water Resources Council. It appears that only one federal district court has assumed that the EO is judicially enforceable. In *Sierra Club v. Hassell,* 503 F.Supp. 552, 564 (S.D. Ala.1980), the district court, without discussion of whether the EO has the force or effect of law or was intended to create a private cause of action, merely stated in a conclusory paragraph that the record before it contained ample evidence of compliance with obligations under the EO, and that it appeared that the appropriate agencies had given due consideration to the impact of construction of the bridge in question on the flood plain area and wet-

lands affected by the construction process. However, on appeal, the Fifth Circuit expressly declined to decide whether Executive Order 11988 permits enforcement through a private cause of action. The Court concluded that even if such an action was authorized, the district court had properly found that the federal agencies involved had "substantially complied" with the EO. *Sierra Club v. Hassell,* 636 F.2d 1095, 1100 (5th Cir.1981).

In view of the lack of precedent holding that the Executive Order 11988 is enforceable through a private cause of action, and the Court's own finding that under relevant Eighth Circuit precedent, the executive order cannot be held to have the force and effect of law, the Court declines to review the defendants' actions under Executive Order 11988.

## PROGRAMMATIC IMPACT STATEMENT

As noted, the R–616 project is part of a comprehensive plan for flood control in the Missouri River Basin first authorized by Congress in the Flood Control Act of 1944. The authorizing act called for a series of levees and of appurtenant works, denominated the Missouri River Levee System, along both sides of the river from Sioux City, Iowa, to the mouth of the Missouri River. It directed that construction proceed in an orderly, step-by-step manner as circumstances and funding permitted. The system was to be constructed by units, and the units selected for the first phase of development were to be those providing the greatest benefits from progressive step-by-step construction. The Missouri River Levee System was designed to work in conjunction with authorized upstream dams and reservoirs. As the upstream dams and reservoirs were being completed, the Missouri River Levee System was being re-evaluated. Re-evaluations of the levee project were made in 1955, 1956, 1959, 1963 and 1971. At the time of trial, only twenty-five levee units of the system had been completed. Those twenty-five units prevent flooding on approximately three hundred two thousand acres of flood plain in Iowa, Kansas, Missouri, and Nebraska.

The plaintiff organization contends that NEPA requires the Corps to prepare a comprehensive or programmatic environmental impact statement for the entire Missouri River Levee System, from Sioux City to the mouth of the Missouri River, before proceeding with the R–616 levee project. The Corps has not to date prepared a programmatic environmental impact statement considering the environmental impact of the Missouri River Levee System as a whole.

■ In order to prevail on this claim, WAR must show that the Corps acted arbitrarily in refusing to prepare one comprehensive statement on the entire Missouri River Levee System. *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976). *See also Environmental Defense Fund, Inc. v. Higginson,* 655 F.2d 1244, 1247 (D.C.Cir.1981). The proper scope of an environmental impact statement and the corollary decision whether to prepare a programmatic EIS at all are matters initially committed to agency discretion. The Supreme Court's decision in *Kleppe* is instructive in determining whether the Corps' decision is arbitrary, capricious or contrary to law.

The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among the proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.

*Id.*

■ In *Kleppe,* environmental organizations sought to compel the Department of the Interior to prepare a comprehensive environmental impact statement covering the development of coal reserves in the

Northern Great Plains Region. The Supreme Court identified two circumstances in which the preparation of a comprehensive environmental impact statement (EIS) may be required under the NEPA. First, the Court made clear that an agency must prepare a comprehensive EIS with respect to any major federal action that is intended to be "regional" in scope. *Id.* at 398–402, 96 S.Ct. at 2724–726. Secondly, the Court noted that, even absent such a regional plan, a

> comprehensive impact statement may be necessary in some cases for an agency to meet (its duty under NEPA). Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can an agency evaluate different courses of action.

*Id.* at 409–10, 96 S.Ct. at 2729–30 (Footnotes omitted.)

"Cumulative environmental impacts are, indeed, what require a comprehensive impact statement." *Id.* at 413, 96 S.Ct. at 2732. The Supreme Court found in *Kleppe*, on the record before it, that the department had not abused its discretion in deciding not to prepare a region-wide EIS.

WAR argues that the Corps has, from the inception of the Missouri River Levee System, regarded it as an integrated, unified plan for development of flood protection for the Missouri River Basin from Sioux City to the mouth of the Missouri, and that the system thus constitutes a "regional plan of development," for which a comprehensive EIS is required under *Kleppe.* In support of this contention, WAR points to documents issued by the Corps, especially the "Definite Project Report—Missouri River Agricultural Levees, Sioux City, Iowa, to the Mouth," dated March 17, 1947. That report, in defining its scope, states that

> The definite project report pertains only to the agricultural levees along the Missouri River and tributary backwater levees between Sioux City, Iowa, and the mouth which is only a part of the general comprehensive plan for the Missouri River Basin. Due to the size and nature of the project, this report has been prepared to constitute a master plan for levee construction rather than a detailed compendium of data and problems to be solved in the construction of this project. This report will serve as a basis for initial contacts and discussions with local interests and will establish the general overall criteria for coordination of detailed studies for individual levee units, as assurances of cooperation are furnished by local interests. This report has been prepared from preliminary reports submitted by the District Engineers at Kansas City, and Omaha, in order to submit a single coordinated report for the entire project.

Plaintiff's Exhibit 6 at p. 2.

The Definite Project Report also included a project plan describing the proposed alignment of the units in the levee system. The plan states that the levee system is divided into individual protective units by the topographic features of the river valley. The units are defined by the larger tributaries, along which tie-back levees will be constructed on or by bluff, or near-bluff, contact of the river. In the later case, the levees will terminate at high ground at the base of the bluff. The Definite Project Report also describes design discharges, minimum widths of floodways, and specifications for the typical levee section. Appendix I presents the basic hydrology for the Missouri River Levee System. Concededly, at its inception, the Corps regarded the Missouri River Levee System as an integrated unified plan for development of flood protection for the Missouri River Basin. When construction of the levee system began in approximately 1948, the only criterion for appropriation of funds for an individual levee unit was that a local sponsor agree to acquire all lands necessary for levee construction without cost to the United States government and to maintain the

levee after its completion. At the time the project was authorized in 1944, an interest rate of 2½ per cent was used to determine that the cost-benefit ratio of the entire Missouri River Levee System project, considered as a whole, indicated that construction of the system was economically justified.

However, in 1958, a policy decision was made by the Missouri River Division of the Corps to add a criterion for individual economic justification. The 1958 policy statement indicated that from that time forward, each separate unit in the system would have to be incrementally justified, on its own merits, for economic utility at the authorized project interest rate of 2½ per cent. At the present time, Corps' policy dictates that a budget request for appropriations cannot be made for construction of a unit in the Missouri River System unless the unit is not only economically justified when tested against the authorized project rate of 2½ per cent, but also when tested at the prevailing interest rate for budgeting of federal projects at the time the cost benefit analysis is performed.[1] Only units having a positive cost-benefit ratio as compared against the prevailing interest rate would normally be recommended for inclusion in the administration's budget request for a forthcoming fiscal year.

In addition to the change of approach to economic justification of the Missouri River Levee System units, testimony at trial also indicates that the Corps no longer, as at its inception, treats the Missouri River Levee System project as one comprehensive program for regional development. Mr. John Velehradsky, Chief of the Planning Division for the Missouri River Division of the Corps of Engineers, testified at trial that at present, twenty-five units of the Missouri River Levee System have been completed, six units are currently classified by the Secretary of the Army as in the active category, one unit is in a deferred status,

and more than one hundred units of the system are classified as inactive. Since the initial authorization of the system, individual units have been re-evaluated at intervals for current economic feasibility as the upstream main stem reservoirs were being completed. Unit R–616 was re-evaluated in 1972, and was found to have a high degree of economic justification. After approval by the Secretary of the Army, Unit R–616 was reclassified to the active category on November 26, 1973. Velehradsky explained that only projects in the active program are considered projects eligible for receiving construction funds and for which the Corps could make a budgetary request in the Administration's budget for a forthcoming fiscal year. Since the FES for Unit R–616 was filed in 1976, no units in the system have gone from inactive or deferred status to active status.[2] Mr. Velehradsky also stated it was unlikely that any unit now classified as inactive would ever be built.

Mr. Velehradsky further testified that all units in the Missouri River Levee System upstream from Omaha to Sioux City are currently in the inactive category and lack economic justification at the 2½ per cent authorized rate. None of the units in the system have been constructed upstream from Omaha. He testified that construction of the main stem reservoir system authorized by the Flood Control Act of 1944 makes flooding relatively unlikely in the stretch from Omaha to Sioux City. Additionally, in recent years, the bed of the river from Omaha upstream has been lowering and the deepened channel has become more effective to cover floods and the need for those levees correspondingly has diminished. Mr. Velehradsky testified that absent a substantial change in the land use which would increase the economic justification for levees in that stretch of the river, or a drastic change in the river regime, that it is not reasonably foreseeable

---

1. Currently, the prevailing interest rate is 7⅝ per cent.

2. A project in deferred status is one that does not meet the current test for economic justifica-

tion, but may require some additional analysis. Projects classified as inactive clearly fail to meet the current tests of economic justification or also lack local support.

that any units of the levee system upstream from Omaha will ever be constructed.

' With respect to the levee units in the near vicinity of Unit R–616, Velehradsky testified that construction of Unit R–611–614, which is the only unit in an active classification in this area, is now substantially completed. Levee Unit R–623 would protect the geographic area known as the Gifford Preserve, which includes part of Fontenelle Forest. Proposed Unit R–623 is currently in the inactive category and Mr. Velehradsky testified that in all likelihood the unit will never be constructed. Land in that area is used only for agricultural and wildlife preserve purposes, which lack the economic value that would ever justify the expense of constructing the long levee which would be required for flood protection in that area. Moreover, he testified that land uses in that area are compatible with the flood plain designation. Proposed Unit R–610, located south of the Platte River where it enters the Missouri, and extending from approximately Highway 73–75 to the city limits of Plattsmouth, Nebraska, is also currently in an inactive status. Its economic feasibility was re-evaluated in 1972 at approximately the same time as Unit R–616 and R–611–614. At that time the unit was not found to be economically justified even as compared against the authorized project rate of 2½ per cent. Velehradsky testified that it is not reasonably foreseeable that R–610 would ever become economically feasible because the levee unit is fairly long compared to the area protected and the area to be protected is basically a wildlife area. Therefore, land use in that area is compatible with the flood plain designation and the benefits of protecting such an area would not justify the cost of construction of the levee.

Mr. Velehradsky testified that in the stretch of river from Omaha to Kansas City, the majority of the authorized units of the levee system have been constructed and construction has been complete for a number of years. Units in the inactive category in that stretch of the river are likely to stay that way because of a lack of economic justification. Since the flood plain of the Missouri River is wider in that reach of the river, it necessitates longer tie-back levees for any streams entering the river to protect from tributary flooding. Mr. Velehradsky testified that the longer the length of tie-back levee which may be necessary, the higher the cost. Moreover, there are private levees in that reach of the river which provide some flood protection. In a cost-benefit analysis, cost benefits of the proposed levee have to be discounted to take into consideration protection being provided by the existing private levees. In view of these factors, Mr. Velehradsky testified that it is not reasonably foreseeable that any of the levee units in the inactive category in this stretch of the river will ever be constructed.

With respect to the stretch of river from the Kansas City area to the mouth of the Missouri River, Mr. Velehradsky testified there are four units currently classified as active: L–385, L–345–330, L–325–319 and L–246. The remainder of the proposed units in the levee system authorized but not yet constructed area are in an inactive category. Mr. Velehradsky testified that they are likely to stay in the inactive category because of the degree of protection provided by existing private levees in that area. He testified that a substantial portion of the entire reach of the river from Kansas City to St. Louis is now protected with private levees. Additionally, the flood plain in this area is wide and fairly long tie-back levees would be required for any federal levees in the area. Also, because design flood discharges are greater in that reach of the river than in the Sioux City to Omaha or Omaha to Kansas City reaches of the river, the height of the federal levees proposed would have to be greater, therefore increasing the cost per unit of length and decreasing economic feasibility. In view of these factors, Mr. Velehradsky testified that it is not reasonably foreseeable that any of the units in the inactive category in this reach of the river will ever be constructed.

With respect to the proposed units in the active category in this reach of the river, Mr. Velehradsky testified that Unit L–246, located in Chariton County, Missouri, is now nearly completed. However, no great likelihood exists that the other three units in the active category in this area will be constructed. Velehradsky testified that the Corps is now reviewing re-evaluation reports on Unit L–385, located in Platte and Clay Counties, Missouri, and it appears that economic justification for this levee unit is marginal at the current rate of interest. He estimated the likelihood of construction of this unit at fifty per cent. Units L–345–330 and L–325–319, located in Ray and Lafayette Counties, Missouri, are currently under re-evaluation review which is not scheduled for completion for at least two more years. Velehradsky testified that preliminary indications are that economic justification of these units are marginal, or maybe submarginal, even at the authorized project rate of 2½ per cent.

Mr. Velehradsky's testimony regarding the unlikelihood of any unit now classified as inactive ever being built was uncontroverted at trial. In his capacity as Chief of the Planning Division for the Missouri River Division of the Corps, his office is responsible for reviewing the feasibility of all water resources projects that are proposed by the Kansas City and Omaha Districts within the Missouri River Division. Therefore, his staff would be responsible for reviewing any re-evaluation reports for any levee unit in this system, and Mr. Velehradsky is responsible for recommending to the Missouri River Division Engineer whether or not to approve a particular levee unit for construction. Accordingly, Mr. Velehradsky is in an optimum position to predict the probability of any other remaining levee units in the system being constructed in the foreseeable future and the Court credits his testimony. Moreover, Velehradsky testified that the Corps has been discussing the feasibility of terminating the re-evaluation studies proposed for the remainder of the individual levee units for the remainder of this decade.

Based on this evidence, the Court concludes that the Missouri River Levee System as it now stands is not a "proposal for major federal action" requiring a programmatic EIS for the entire system. While at its inception, the "Definite Project Report, Missouri River Agricultural Levees, Sioux City, Iowa, to the Mouth," dated March 17, 1947, may have constituted a proposal for major federal action for which a programmatic EIS would have been required, had the requirements of NEPA then been applicable, the Court finds under the particular facts of this case that the Missouri River Levee System is no longer in reality one major project for regional development requiring such an EIS for the entire river. Even though individual levee projects are proposed pursuant to the "master plan for levee construction" contained in the Definite Project Report, the individual levee projects are now separately proposed to accomplish independent purposes, and must be independently justified. They now only appear to be part of an over-all plan for regional development because they were treated that way at the inception of the Missouri River Levee System project. *See Piedmont Heights Civil Club, Inc. v. Moreland,* 637 F.2d 430, 441 (5th Cir.1981). Moreover, the evidence indicates that construction of the levee system as a whole is now substantially completed. The vast majority of the unconstructed units in the system have been placed by the Corps in an inactive status and the evidence indicates that they are likely to remain there. As recognized by the courts interpreting *Kleppe,* the basic function of a programmatic EIS is to serve as a forward-looking instrument to assist in evaluating "proposals" for major federal action, and not to serve as an after-the-fact justification for a multi-phase development already substantially completed. *See National Wildlife Federation v. Appalachian Regional Commission,* 677 F.2d 883, 889 (D.C.Cir.1981); *Aertsen v. Landrieu,* 637 F.2d 12, 19 (1st Cir.1980). Where substantial construction of a project has already been realized, the "forward-looking" criterion suggests that where new construction

is necessary to finish off work already done, such new work does not then trigger an obligatory EIS evaluating program-wide effects. *National Wildlife Federation, supra,* 677 F.2d at 889. The "Missouri River Levee System" has simply reached such a stage of completion that the programmatic EIS requirement can no longer practically apply. The system can no longer be considered a "regional plan of development" for which a programmatic EIS is required under *Kleppe.*

However, WAR contends that even if the Missouri River Levee System can no longer be considered a regional plan for development, the cumulative effect of construction of separate levee units in this system requires an overall regional EIS to consider the environmental consequences of the system as a whole. In support of this argument, WAR relies on the *Kleppe* Court's statement that

A comprehensive impact statement may be necessary in some cases * * *. Thus, when several proposals for (related) actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.

427 U.S. at 410, 96 S.Ct. at 2730 (Footnote omitted.)

The Court concludes that this is not a situation where several proposals for related actions which will have a "cumulative or synergistic" environmental impact upon a region are pending concurrently before the Corps. At trial, plaintiff's expert, Doctor T. Al Austin, testified that theoretically there would be expected basic categories of cumulative, interrelated hydrologic and hydraulic impacts resulting from construction of all the authorized units of the Missouri River Levee System. The range of cumulative impact would in-

clude increased flood stages, increases in water velocity, peak flow attenuation and loss of flood plain storage resulting from confinement of flood water by the system of levees.[3] However, the Court has already found that there is no reasonable likelihood that all the authorized units of the Missouri River Levee System will ever be constructed. Even assuming that all units now classified as active by the Corps will be built, plaintiff's expert testified to his opinion that, assuming for the moment that the only levees that will ever be constructed in the system from this date forward are those units now in the active program, the cumulative effects of those levees on river hydrology would not justify a programmatic EIS covering the whole river. Doctor Austin stated that there would be no measurable hydrologic or hydraulic interrelationship between Unit R-616 and L-611-614 and the other levees classified as active by the Corps, which are all downstream from R-616 in the area of Kansas City.

Moreover, the Court finds no evidence that the Corps has segmented a project with cumulative effects into smaller components in order in evade its responsibility to consider programmatic environmental impacts of the Missouri River Levee System as a whole. As the Eighth Circuit has noted, courts have been presented with the issue of "segmentation" of impact statements in a number of various contexts, and ennunciation of a general rule that will cover all cases is impossible. Instead,

the crucial dependence is upon the facts before the Court in the particular case sub judice. Where it is found that the project before the court is an essentially independent one, an EIS for that project alone has been found sufficient compliance with the Act. In such case there is no irretrievable commitment of resources beyond what is actually expended in an individual project.

3. Doctor Austin is a professor of Civil Engineering at Iowa State University and Assistant Director of the Iowa State Water Resources Research Institute. Doctor Austin teaches courses in hydrology and hydraulics.

*Sierra Club v. Froehlke,* 534 F.2d 1289, 1297 (8th Cir.1976).

In *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1306 (8th Cir.1976), the Eighth Circuit reaffirmed that even after *Kleppe's* recognition that a comprehensive impact statement may be required where proposed federal actions will have a "cumulative or synergistic" environmental impact upon an area, the need for such a statement depends on the facts of each case, and the critical question remains under *Sierra Club v. Froehlke,* "whether the actions are essentially independent or interdependent and whether each action involves an irretrievable commitment of resources beyond what is actually expended on each project."

In *Sierra Club v. Froehlke, supra,* the Eighth Circuit considered and rejected a contention that a programmatic EIS should have been prepared under factual circumstances strikingly similar to those now before the Court. Plaintiffs in that case sought to halt construction of the Meramec Park Lake Dam Project, which was one part of a comprehensive plan for flood control in the Meramec Basin area authorized by Congress in the Flood Control Act of 1966. That plan was in turn a part of a comprehensive plan for flood control in the upper Mississippi Basin first authorized by Congress in the River and Harbor Flood Control Act of 1938. In addition to the Meramec Park and Union Reservoirs, which were first authorized in 1938, the 1966 plan authorized three additional reservoirs, Pine Ford, Iron Dale, and I–38, all of which were to be located in the Meramec Basin. At the time of trial, Meramec Park Lake was under construction, Union Lake was ready for the appropriation of construction funds, and no funds had been appropriated for the Pine Ford, Iron Dale, or I–38 projects. The plaintiffs contended that the Corps should have filed an EIS which considered the cumulative impacts of the entire Meramec Basin plan and not the Meramec Dam project alone.

The Court, in rejecting this contention, noted that there had been testimony that

the Meramec project had a drainage area of about fifteen hundred square miles, controlling the run-off from that area, and thus contributing to some degree to the satisfaction of project purposes in itself. It found that this situation would not be altered by the non-construction of the Union, Pine Ford, I–38 or Iron Dale projects. In short, the Meramec project's share of the overall project purposes were not dependent upon any other impoundment. Additionally, there was testimony that there existed no assurance that other lakes and dams would ever be built or exactly where or with what characteristics. The Court noted that it seemed clear that environmental impact of other reservoir projects "cannot be determined to a reasonable degree in the absence of detailed planning therefor." *Id.* at 1297.

 As was the case in *Froehlke,* here it is clear that while each levee unit has an incremental effect in meeting the total flood control needs of the Missouri River flood plain, the proposed units of the system operate independently of each other. Each unit, acting alone, satisfies a portion of the river's needs. The evidence here, too, shows that a determination of whether or not any of the other proposed units in the system will ever be constructed would require speculation on the part of this Court. This is not a case where construction of the R–616 project will result in the irretrievable commitment of resources towards any other unit in the levee system. Nor is there any evidence that each unit is not a separate, viable entity or that any unit is merely a component, increment or first segment of a second. *See Sierra Club v. Froehlke, supra,* 534 F.2d at 1297–98. Based on these factors and the standards stated in *Sierra Club v. Froehlke,* the Court declines to find that the Corps is guilty of segmentation of environmental review that avoids overall programmatic evaluation. The Court holds that preparation of site-specific EIS's in connection with the units of the Missouri River Levee System, as the system currently stands, is sufficient compliance with the NEPA, and

that the plaintiff has failed to show arbitrary action in the Corps' refusal to prepare a programmatic EIS with respect to all of the authorized units of the Missouri River Levee System.

## IMPACT ON FISH AND WILDLIFE

Plaintiff contests the adequacy of the discussion in the FES concerning the project's potential impact on fish and wildlife and their habitat. Plaintiff argues that the FES describes potential impacts on fish and wildlife and their habitat only in general terms without quantifying such impacts. Plaintiff also faults the FES for an alleged failure to adequately discuss the secondary or indirect impacts of the project on fish and wildlife which may result, not from the construction of R–616 itself, but from the increased industrial development of the flood plain induced by the levee's construction.

Judicial review of compliance with the procedural requirements of the NEPA centers on Section 102 of the NEPA, 42 U.S.C. § 4332. Section 102(2)(C) of NEPA provides that in every recommendation or report on a proposal for major federal action significantly affecting the quality of the human environment, federal agencies shall include a "detailed statement" by the responsible official concerning:

(i) The environmental impact of the proposed action,

(ii) Any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) Alternatives to the proposed action,

(iv) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1299 (8th Cir.1976).

The Eighth Circuit has stated the standard for judicial review of the "detailed statement" requirement of Section 102(2)(C):

We have held the test of compliance with the procedural provisions of Section 102(2)(C) is one of good faith objectivity. *EDF v. Corps, supra,* 470 F.2d [289] at 296 ((8th Cir.1972), *cert. denied,* 412 U.S. 931 [93 S.Ct. 2749, 37 L.Ed.2d 160] (1973)). The touchstone of our inquiry is reason. *Iowa Citizens for Environmental Quality, Inc. (ICEQ) v. Volpe,* 487 F.2d 849, 852 (8th Cir.1973). While the detailed statement must of course be more than a pro forma ritual, *EDF v. Froehlke,* 368 F.Supp. 231, 237 (W.D.Mo. 1973), *aff'd per curiam sub nom EDF v. Callaway,* 497 F.2d 1340 (8th Cir.1974), the discussion of environmental effects and alternative courses of action need not be exhausted. *ICEQ v. Volpe, supra,* 487 F.2d at 852.

[NEPA] must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the nation's needs are not infinite. *Natural Resources Defense Council, Inc., (NRDC) v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). *See also ICEQ v. Volpe, supra,* 487 F.2d at 852. Thus, the EIS need contain only sufficient information to permit a reasoned choice of alternatives. *Id.; NRDC v. Morton, supra,* 458 F.2d at 837. The purpose of NEPA is not to require an objection-free document, but rather to give Congress, the responsible agencies, and the public a useful decision-making tool. *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404, 412 (W.D.Va.), *aff'd per curiam,* 484 F.2d 543 (4th Cir.1973).

*Minnesota Public Interest Research Group v. Butz, supra,* 541 F.2d at 1300.

It is clear that here the burden is upon the plaintiff to establish by a preponderance of the evidence that the defendants' actions do not comply with these standards and that the FES is therefore inade-

quate. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (8th Cir.1976); *Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir.1975). The Court finds for the reasons which follow that plaintiffs have not met this burden with respect to the alleged deficiencies in the discussion in the FES concerning direct and secondary impacts of the R–616 project on fish and wildlife.

Plaintiff focuses its attack on the adequacy of the FES's discussion of direct impacts of the R–616 project on fish and wildlife on the availability of quantitative methods of scientific evaluation which were not used by the Corps. Plaintiff presented expert witnesses who opined that because of the Corps' failure to use these quantitative methods of evaluation,[4] the impacts of the project could not be understood from the FES.

However, plaintiff has failed to address the important threshold issue. The plaintiff organization does not claim here that the project's probable impact on fish and wildlife will be significant, nor has plaintiff presented evidence which would support such a claim. As stated in *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974), a reasonably thorough discussion of "the significant aspects of the probable environmental consequences" is all that is required. *See also Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060, 1067 (8th Cir.1977); *Save the Niobrara River Association v. Andrus,* 483 F.Supp. 844, 850 (D.Neb.1979); *United Family Farmers, Inc. v. Kleppe,* 418 F.Supp. 591, 596 (D.S.D.1976), *aff'd,* 552 F.2d 823 (8th Cir.1977).

The Court is persuaded that neither the direct nor indirect impact of the proposed project on fish and wildlife will be significant and that therefore the somewhat cursory discussion of such impacts in the FES is warranted. This case is clearly distinguishable from the situation in which no one denies that the impact of a project on wildlife would be consequential. *Cf. Save the Niobrara River Association v. An-*

*drus, supra,* 483 F.Supp. at 860. In such a case, a quantitative correlation of the pre-construction wildlife population of the present habitat and a comparison of the capacities of the present habitat and proposed post-construction habitat to maintain the species of wildlife found in the area might be necessary to provide the "detailed statement" required on any significant adverse environmental effect by the NEPA. This is simply not such a case. Here the record indicates that the conclusion that the direct impacts of the project on fish and wildlife would not be significant was reached after field studies by a Corps biologist using an accepted method within the Corps for evaluating project-induced wildlife impacts. This method consisted of a survey of the type of wildlife to be found in the project area and a quantification of the number of acres of significant wildlife habitat to be lost to the project. A United States Fish and Wildlife Service (FWS) biologist, who accompanied the Corps biologist on the field studies to evaluate the impact of the project for the purpose of preparing the FWS Fish and Wildlife Coordination Act report and letter of comment on R–616 FES also concluded that the direct impact of the project on wildlife would be insignificant. Appendix A of the FES contains the FWS's Coordination Act Report, dated May 23, 1975, in which the FWS concluded, based on their studies, that "existing wildlife habitat is limited in the area of the proposed R–616 levee, and direct losses will be relatively insignificant." Accordingly, there is nothing in the record to negate the conclusion that direct impact of the project on fish and wildlife would be insignificant or that the conclusion was reached after less than good faith study and consultation with the FWS.

In view of the insignificant impact of the project on fish and wildlife, the Court finds the discussion in the FES concerning the direct impact of the project on fish and wildlife to be adequate. Paragraph 2.31 of the FES describes the effect of man's past

---

**4.** These procedures are generally referred to as "EP squared" (Ecological Planning Evaluation

Procedures) and "HEP" (Habitat Evaluation Procedure), a refinement of EP squared.

actions on the ecology of the river valley, concluding that flood control, bank stabilization, channel control works, and navigation have already changed the ecology of the Missouri River valley, having caused a drastic reduction of both water surface area and young riverine communities, to the point that little of the habitat which once naturally occurred along the river remains today.

Paragraph 2.32 concludes that in the portion of the Missouri River valley where the proposed project is to be located, the young riverine communities have almost completely disappeared. Paragraphs 2.33 through 2.48 describe the present environment within the project area, including a description of trees, shrubs, grasses and plants to be found, as well as the description of all types of wildlife. Paragraph 4.10 of the FES describes the primary areas of wildlife habitat that the proposed levee will pass through. Table II presents a summary of the number of acres of different types of major woody and brushy habitat areas to be affected by construction. The FES concludes that construction of the project will require the removal of approximately twenty-one acres of trees and shrubs in several areas. Paragraph 4.34 describes the Corps' mitigation plan. In order to mitigate the loss of the twenty-one acres of trees and shrubs in the area, the FES proposes that a permanent easement on 12.5 acres will be obtained from the City of Omaha to implement a wildlife habitat planning program. The trees, shrubs, herbs and grasses to be planted are of high value to wildlife as food and cover. As a project feature, the plantings in this area will be protected against removal, thereby assuring a lasting wildlife habitat. In addition, Paragraph 4.35 describes a grass mixture proposed for vegetating the levee slopes themselves which will provide a quality habitat for wildlife. While a more detailed statement of the impact of the project on fish and wildlife may have been helpful, under the circumstances of this case, the Court cannot conclude that the statutory minimum under the NEPA has not been met.

Plaintiff also contends that the FES fails to adequately evaluate the secondary impact of the project on fish and wildlife. This Circuit has recognized that if an impact significantly affects the environment, it should be considered in an FES whether the impact is a primary or secondary one, but that an FES need not discuss remote and highly speculative consequences. *Environmental Defense Fund, Inc. v. Hoffman, supra,* 566 F.2d at 1067.

The FES states that the land intended to be protected by Unit R–616 project is presently used primarily for crop production. After construction of Unit R–616, industry is expected to gradually move into the flood plain. The FES states that construction of R–616 will therefore result in increased development of the flood plain. At Paragraph 7.02, the FES describes the long-term effect on remaining wildlife as "a gradual intrusion of the habitat as the area becomes developed." At Paragraph 5.03, the FES concedes that human intrusion associated with the change of land use (agricultural to urban) will be an indirect result of the levee, and that this intrusion may take place in the form of urban recreation, industry or housing, all of which could remove the remnants of vegetation which exist today, thereby forcing some of the remaining wildlife from the area.

Plaintiff contends that a more detailed discussion of the indirect impact of the project on wildlife and its habitat is required. However, again, plaintiff has failed to suggest or show by a preponderance of the evidence that the indirect impacts of the project on wildlife are likely to be significant. To the contrary, the evidence shows that intensified land use in the project area, and a resulting loss of wildlife habitat, are inevitable even without the project. The FWS, in a letter dated July 9, 1980, concluded "that the development of fourteen acres of shelterbelts for wildlife as planned is more beneficial than to allow all lands within the project to be lost to future development." Moreover, the Court cannot agree that the failure to include a more thorough discussion of the secondary

impact of the project on fish and wildlife renders the FES defective since the degree of change in land use resulting from the project can only be characterized as a "remote and highly speculative consequence."

■ The plaintiff having failed to challenge the conclusion that the direct and indirect impacts of the project on fish and wildlife will be insignificant, and the Court having found that said conclusion is not arbitrary, no occasion exists for the Court to address the plaintiff's disagreement with the techniques of scientific field evaluation used by the Corps in the FES. However, the Court notes in passing that in the absence of a showing of arbitrariness, methods of quantification are without question matters of judgment and opinion and as such, belong with the discretion of the agency involved. The NEPA does not contemplate or anticipate that courts are to make choices in determining the merits of conflicting views between two or more schools of scientific thought. *Minnesota Public Interest Research Group v. Butz, supra,* 541 F.2d at 1302.

Plaintiff's final contention is that the supplement to the FES and the SIR issued by the Corps were required to be circulated for agency and public comment in the same manner required for a draft EIS. However, the context in which plaintiff raises this challenge obviates the need for an extended discussion of this issue. The real thrust of plaintiff's concern is with the SIR. Plaintiff's claim is that the Court cannot consider the additional discussion in the SIR concerning the project's impact on fish and wildlife to "cure" the alleged inadequacies of the FES under the NEPA, because the SIR was not circulated in the manner required for a draft EIS.

■ The SIR was prepared pursuant to a Corps regulation providing that where "it is clearly understood that an EIS supplement is not necessary," but where it is only necessary to provide supplemental information to a point of concern already discussed in a final EIS, which was considered in making the decision of the proposed action, an SIR can be prepared and filed with the

NEPA. *See* 30 C.F.R. § 230.11(d) (1980). An SIR is not required under the regulations to be formally circulated as a draft in the same manner required for a draft EIS. Plaintiff contends that the SIR contained significant project changes and new environmental information and therefore should have been circulated for comment as a supplemental EIS in the same manner that a draft EIS must be circulated. Plaintiff asserts that without such circulation, the SIR cannot be considered by the Court to "cure" the alleged inadequancies of the FES under the NEPA. However, the Court having found the plaintiff's claims of inadequacies in the FES to be meritless, no occasion arises to consider whether the SIR may be used to "bolster" an otherwise deficient FES.

Accordingly, the Court having found no merit to any of the plaintiff's challenges under the NEPA, and having concluded that it lacks authority to review defendants' actions under the executive order in question, a separate order shall be entered in accordance with this memorandum opinion dismissing plaintiff's complaint on its merits and dissolving the order previously entered herein enjoining the defendants from proceeding with construction of the R–616 project.