**PARK COUNTY RESOURCE**
**COUNCIL, INC., et al.,**
**Plaintiffs-Appellants,**

v.

**UNITED STATES DEPARTMENT OF**
**AGRICULTURE, et al.,**
**Defendants-Appellees,**

**and**

**Marathon Oil Company, et al.,**
**Defendants-Intervenors/Appellees,**

**Mountain States Legal Foundation,**
**Amicus Curiae.**

No. 85–2000.

United States Court of Appeals,
Tenth Circuit.

April 17, 1987.

Patrick J. Marley and Marc L. Goldstein of Cole & Marley, Los Angeles, Cal. (the law firm of Spence, Moriarity & Schuster, Jackson, Wyo., and Don W. Riske, Cheyenne, Wyo., with them on the brief), for plaintiffs-appellants.

Ellen J. Durkee, Dept. of Justice, Washington, D.C. (F. Henry Habicht II, Asst. Atty. Gen.; Richard A. Stacy, U.S. Atty., for the Dist. of Wyo.; and Jacques B. Gelin, Dept. of Justice; and Marla Mansfield and William R. Murray, Jr., Office of the Solicitor, Dept. of the Interior, Washington, D.C.; and Michael J. Gippert and Pamela Piech, Office of General Counsel, Dept. of Agriculture, Washington, D.C., of counsel), for defendants-appellees.

Stanley K. Hathaway of Hathaway, Speight and Kunz, Cheyenne, Wyo. (Brent R. Kunz of Hathaway, Speight and Kunz, Cheyenne, Wyo., and Clyde O. Martz and Charles L. Kaiser of Davis, Graham & Stubbs, Denver, Colo., with him on the brief), for defendants-intervenors/appellees.

Constance E. Brooks and Matthew Y. Biscan of Mountain States Legal Foundation, Denver, Colo., for amicus curiae.

Before McKAY, SEYMOUR and TACHA, Circuit Judges.

McKAY, Circuit Judge.

Section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4370 (1982 & Supp. III 1985) (NEPA), requires that all federal agencies prepare a detailed environmental impact statement (EIS) "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The plaintiffs in this suit contend that the Bureau of Land Management (BLM) unlawfully issued an oil and gas lease, and thereafter unlawfully approved an Application for Permit to Drill (APD) filed by the Marathon Oil Company, in contravention of both NEPA and the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543 (1982 & Supp. III 1985) (ESA). They appeal the district court's denial of a preliminary injunction enjoining the issuance of the permit to drill

as well as its dismissal of their suit with prejudice.

## I. *Facts*

In 1979, the Forest Service prepared an extensive environmental assessment (EA) exceeding 100 pages and addressing issuance of federal oil and gas leases in the Shoshone and other forests in the Rocky Mountain Region. Record, vol. 8, exhibit C. The EA explores various leasing alternatives, including issuance of leases without stipulations, issuance of leases with stipulations, and issuance of no leases. It examines the potential effects of each of these alternatives on energy use and conservation, on national forest administration, and, as its name indicates, on the environment. It concludes that "[o]il and gas lease issuance, as such, creates no environmental impacts. The imposition of appropriate stipulatory controls for operations subsequent to lease issuance can, in most cases, prevent or satisfactorily mitigate unacceptable environmental impacts." *Id.* at 14. Consequently, the Forest Service's announced preferred alternative is to recommend lease issuance with appropriate stipulations. *Id.* The EA specifically notes that prior to any drilling activity, the need for a site-specific, much more comprehensive EIS must be examined. *Id.* at app. sec. III.

On November 9, 1979, the Regional Forester issued a Finding of No Significant Impact (FONSI) with respect to lease issuance. The FONSI indicated that issuance of oil and gas leases would have no significant impact on the human environment, meaning that the preparation of an EIS pursuant to NEPA would not be necessary at this stage.

On November 5, 1980, May Petroleum, Inc., filed with BLM an oil and gas lease offer which encompassed 10,174 acres of non-wilderness, multiple-use land[1] in the

---

1. The lease area has never been designated a wilderness, wilderness study, park, or other restricted-use area. The district court noted:
 Congress has had three chances in recent years to incorporate these lands into a Wilder-

ness Area, but each time has refused to do so, including in 1984 when the lands in question were once again classified as multiple-use areas in the Wyoming Wilderness Act....

Shoshone National Forest. As is routine with such offers, BLM requested the Forest Service to advise whether the lease should issue, and, if so, to recommend appropriate stipulations to protect the environment. The Regional Forester recommended lease issuance, and BLM issued the lease on July 9, 1982, with an effective date of August 1, 1982.

The lease contained a number of provisions and stipulations providing for environmental resource and safety protections. It required the lessee to take all reasonable steps to prevent unnecessary soil erosion or timber damage, unnecessary air and water pollution, and unnecessary damage of surface improvements, fossils or artifacts and to restore the land surface to its .former condition after use is terminated. Lease, section 2(q), record, vol. 6, exhibit 21, at 91; Lease, Stipulation for Lands Under Jurisdiction of Department of Agriculture, *id.* at 93. It also required prior approval, as well as the preparation of further EAs, before any surface-disturbing actions, such as drilling. Lease, Surface Disturbance Stipulations, *id.* at 93–94. Also prior to undertaking any ground disturbance activities, the lands had to be surveyed for any endangered or threatened plant or animal species, and a report thereon filed, possibly resulting in use restrictions or even complete use prohibition. *Id.* at 94. Finally, the lease restricted use of certain areas during specified time periods of the year for the protection of big game habitat, as well as for the preservation of the land's recreational use. Lease, Limited Surface Use Stipulation, *id.* at 94.

On June 21, 1983, Marathon Oil, the lessee's operator, submitted an APD in order to drill an exploratory well (North Fork Well) in the leased area. BLM announced in August of 1983 that it, in conjunction with the Forest Service, would prepare an EIS with respect to the drilling application.

The study area consisted of approximately 39,000 acres, extending well beyond the 2.5 acre well area and even the 10,000 acre lease area. The exhaustive process spanned more than a year, employed numerous environmental specialists,[2] and involved both a preliminary and a final draft, the latter 160–page document incorporating considerations and suggestions received during the public comment period and from other government agencies. Pursuant to ESA, BLM also conducted a Biological Assessment which evaluated the proposed action on threatened and endangered animal species, including the grizzly bear, peregrine falcon, bald eagle, and gray wolf. In this regard, the United States Fish and Wildlife Service was consulted.

Although evaluating several alternatives, the final EIS recommended allowing the drilling of the North Fork Well, and permitting water transport to the site through a temporary pipeline, but restricting access to the drill site to helicopter access only, as opposed to temporary roads. It concluded that this proposal best permitted a valid test for oil and gas potential while minimizing adverse environmental impacts. On May 9, 1985, the BLM district manager issued a record of decision approving the APD on the condition that several additional mitigation measures to protect the environment be imposed. Record of Decision for APD, record, vol. 6, exhibit 24.

The record and briefs on appeal extensively explore the procedural adequacy of the EIS and the Biological Assessment. However, in light of our disposition of that issue, *see infra* section III, we need not recount such evidence here.

## II. *Procedural History*

On May 31, 1985, plaintiffs appealed the APD approval to the Interior Board of

[M]ultiple-use does include oil and gas drilling.
*Park County Resource Council, Inc. v. United States Dep't of Agric.*, 613 F.Supp. 1182, 1187 (D.Wyo.1985).

**2.** An interdisciplinary team of experts examined Marathon Oil's proposal and prepared the draft and final EISs. The team included several hydrologists, a soil scientist, several wildlife biologists, a geologist, a transportation planner, two landscape architects, a botanist, a physical scientist, an environmental scientist, an environmental coordinator, and two sociologists. *See* Draft EIS, record, vol. 8, exhibit A, at 61; Final EIS, record, vol. 8, exhibit B, at 63–64.

Land Appeals (IBLA). On June 3, 1985, before IBLA rendered its decision, plaintiffs filed this action requesting an injunction prohibiting oil exploration and drilling at the North Fork Well and all future sites until the Government complied with NEPA by preparing an adequate EIS. They also challenged for the first time the underlying 1982 lease issuance and requested a declaratory judgment stating "that the issuance of a lease which may be used to drill for oil and establish a wildcat well on National Forest Service Lands constitutes a major federal action which significantly affects the quality of the human environment, and thereby requires the preparation of an EIS." Complaint, record, vol. 1, at 10. They also prayed for an order "requiring defendants to withdraw their approval on any leases or permits previously given pending their compliance with the provisions and requirements of NEPA." *Id.* at 11.

Thereafter, plaintiffs filed an application for a temporary restraining order and for a preliminary injunction. The district court denied the TRO after an evidentiary hearing. With the consent of all parties, the court consolidated the preliminary injunction hearing with the trial on the merits, at which eleven witnesses testified. At the conclusion of the proceedings, the court orally denied the preliminary injunction and dismissed plaintiffs' complaint with prejudice. A written opinion was issued shortly thereafter. *See Park County Resource Council, Inc. v. United States Dep't of Agric.,* 613 F.Supp. 1182 (D.Wyo.1985).

The district court barred as untimely the claim that an EIS, rather than an EA, was required prior to the lease issuance itself, citing the ninety-day statute of limitations contained in the Mineral Lands Leasing Act, 30 U.S.C. § 226–2 (1982). Alternatively, the court found the claim to be barred by the equitable defense of laches, as well as by failure to exhaust administrative remedies. In an abundance of caution, however, the court further held that even if the challenge of the FONSI with respect to the lease issuance was not barred, the claim failed on the merits.

As to the second NEPA claim regarding the APD approval, the court found that plaintiffs failed to demonstrate any procedural inadequacy in the EIS for the North Fork Well drilling. Moreover, it found that the agencies' actions pursuant to ESA were not arbitrary and capricious. While admitting sympathy for plaintiffs' concerns about the environment, the court concluded that

> all [plaintiffs] have proven is that a "no action" alternative would better suit their wishes, vocations, or lifestyles. None of the eight witnesses called by plaintiffs and none of the affiants, whose affidavits plaintiffs presented, identified any real factual objection to the documents prepared by the federal defendants prior to rendering their decisions on the lease and APD.... To the contrary, as admitted by a number of plaintiffs' witnesses, plaintiffs' quarrel is with the decision to permit exploration activities on the lease, not the administrative record on which the decisions objected to are based.

*Park County Resource Council, Inc.,* 613 F.Supp. at 1188–89.

Plaintiffs unsuccessfully sought, both from this court and the Supreme Court, a stay of the drilling activities pending appeal. Since the district court's judgment was rendered, drilling of the North Fork Well has been completed, resulting in a dry hole. Reclamation work at the site has also been completed and is now being monitored.

### III. *APD Challenge*

Plaintiffs' challenge of the APD approval based on the allegedly inadequate EIS and their appeal of the denial of a preliminary injunction prohibiting drilling at the North Fork site until a more thorough EIS is prepared must be dismissed as moot.

 To satisfy the article III case-or-controversy prerequisite for federal court jurisdiction, the litigant must have suffered actual injury that can be redressed by favorable judicial decision. *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983) (per

curiam); *Blinder, Robinson & Co. v. SEC,* 748 F.2d 1415, 1418 (10th Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985). The redressability arm of the case-or-controversy requirement is not satisfied here. Drilling at the well site has been abandoned, and reclamation work has now been completed. Reversal of the district court's denial of a preliminary injunction prohibiting drilling would now be no more than an empty gesture. No resolution of this portion of plaintiffs' dispute can redress their grievance concerning the APD approval pursuant to an allegedly insufficient EIS. That redressability was possible when the suit was initiated does not cure the jurisdictional defect on appeal, for "a court can determine the merits of a controversy only if jurisdiction exists at all stages of the proceeding." *Amalgamated Sugar Co. v. Bergland,* 664 F.2d 818, 822 (10th Cir.1981).

In addressing the mootness issue, plaintiffs state that "[a]lthough there is no present need for injunctive relief because the subject 'wildcat' oil well has already been drilled and was dry, appellants believe that the issues presented in this brief are of great public importance and require consideration by this Honorable Court." Appellants' Opening Brief at 5–6. They further contend that "[t]he fact that the well has been drilled does not cure the legal issues raised by this appeal. Appellants feel very strongly that this Honorable Court should reverse the decision of the lower court." *Id.* at 33.

█ That they "feel very strongly" that we should address the merits of this issue and reverse the district court is not helpful. "Emotional involvement in a lawsuit is not enough to meet the case-or-controversy requirement; were the rule otherwise, few cases could ever become moot." *Ashcroft v. Mattis,* 431 U.S. 171, 173, 97 S.Ct. 1739, 1740, 52 L.Ed.2d 219 (1977) (per curiam). Moreover, that we fail to "cure the legal issues" when we dismiss this claim is also of no moment. In every case dismissed as moot, legal questions are necessarily left unresolved. When the underlying facts illuminating the legal issue no longer exist,

we would be doing nothing more than rendering an advisory opinion as to an abstract question of law were we to retain jurisdiction. Such is not within our purview under article III. Merely because an issue may be "of great public importance" does not vest this court with the power to *address* the complaint, absent the concomitant ability to *redress* it. *See Richland Park Homeowners Ass'n, Inc. v. Pierce,* 671 F.2d 935, 941–42 (5th Cir.1982); *City of Romulus v. County of Wayne,* 634 F.2d 347, 348–49 (6th Cir.1980); *Florida Wildlife Fed'n v. Goldschmidt,* 611 F.2d 547, 549 (5th Cir.1980); *Friends of the Earth, Inc. v. Bergland,* 576 F.2d 1377, 1378–79 (9th Cir.1978); *Ogunquit Village Corp. v. Davis,* 553 F.2d 243, 246–47 (1st Cir.1977) (NEPA challenges all considered moot where activity or project completed or nearly completed at time of appeal).

## IV. *Lease Issuance Challenge*

Plaintiffs' challenge to the validity of the 1982 lease issuance, unlike their challenge to the APD, has not been mooted by Marathon Oil's abandonment of the North Fork Well site. The lease remains extant, and, under its authority, Marathon Oil has represented that it "may in the future seek approval from federal defendants to drill an additional well in the North Fork Well Area." Intervenors' Answer Brief at 15. The suit dismissed by the district court prayed for a declaratory judgment that the issuance of an oil and gas lease on National Forest Service Lands requires the preparation of an EIS pursuant to NEPA and also asked the court to order the defendants to withdraw their approval to the lease in question pending compliance with NEPA. *See supra* section II. Reversal of the district court's dismissal would result in redress of plaintiffs' grievance. Moreover, since the lease remains operative at present, issuance of the requested declaratory judgment and order would not constitute "an advisory opinion upon a hypothetical basis, but ... an adjudication of present right upon established facts." *Ashcroft,* 431 U.S. at 172, 97 S.Ct. at 1740 (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S.

227, 242, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)).

### A.

Prior to addressing the merits of plaintiffs' challenge, the district court held that plaintiffs were barred on three distinct grounds from maintaining their cause of action. Thus, we must first address these three bases before reaching the merits.

■ First, the district court ruled that the present action was time-barred under the ninety-day statute of limitations found in the Mineral Lands Leasing Act, 30 U.S.C. § 226-2 (1982) (MLLA). That statute provides: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." *Id.* While the subject lease was issued in 1982, suit was not instituted until 1985. No other court has addressed the issue of whether the MLLA statute of limitations applies to NEPA challenges that happen to involve an oil and gas lease. We disagree with the trial court and hold that this statute is inapplicable in such cases.

The thrust of our reasoning parallels that of the Ninth Circuit in *Jones v. Gordon,* 792 F.2d 821 (9th Cir.1986). In that case, plaintiffs challenged the issuance by the National Marine Fisheries Service (Service) of a permit that authorized Sea World to capture killer whales. The plaintiffs alleged that the Service's issuance of the permit without prior preparation of an EIS violated NEPA. The general act prescribing the procedure for issuance of such permits is the Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361-1407 (1982) (MMPA).

The Ninth Circuit rejected Sea World's claim that plaintiffs' challenge, brought six months after the permit's issuance, was time-barred by the sixty-day statute of limitations found in the MMPA itself for "judicial review of the terms and conditions of any permit issued by the Secretary under this section or of his refusal to issue such a permit." 16 U.S.C. § 1374(d)(6). The court found that, rather than disputing the *substantive* "terms and conditions" of the permit, plaintiffs were challenging the *procedural* failure to comply with NEPA. While recognizing that a NEPA procedural challenge can indirectly implicate some terms and conditions—even the validity—of the permit, the court held that plaintiffs' challenge was essentially procedural in character and thus not controlled by the statute of limitations found in the MMPA.

Similarly, the MLLA statute of limitations at issue here applies only to actions contesting either the lease issuance or substantive decisions relating to the lease itself. It applies in cases challenging lack of compliance with all the intricate requirements of Subchapter IV of the MLLA which deals with oil and gas leasing. The present action is not one "contesting decisions of the Secretary of the Interior *under the Mineral Leasing Act.*" H.R.Rep. No. 2135, 86th Cong., 2d Sess. 14 (1960), U.S.Code Cong. & Admin.News 1960, pp. 3313, 3337 (emphasis added). It is an action contesting a decision *under NEPA,* challenging defendants' decision to forego preparation of an EIS that plaintiffs contend is statutorily mandated.

The standards applicable to any effort to enforce NEPA should apply here. Otherwise, the singular NEPA claim—that a contemplated federal action is a "major" one "significantly affecting the quality of the human environment," thus requiring preparation of an EIS under NEPA—would be time-barred at any number of times, depending upon which statute the underlying agency action is based. A NEPA challenge to a permit issued under the MMPA would be barred at sixty days, while that same NEPA challenge would be barred at ninety days if it happened to involve an oil and gas lease. Still other identical NEPA claims could technically remain alive for decades if the challenged federal action was not subject to a statute of limitations.

We decline to impute to Congress the intention that such an arbitrary and inconsistent approach to NEPA claims should prevail. The mere happenstance that the

present NEPA action involves an oil and gas lease does not remove it from general NEPA principles regarding the timeliness of suit and has no bearing on NEPA enforcement. A contrary holding would be no more than a blind application of a statute of limitations in a context in which its application was not envisioned and would result in illogical and capricious administration of an important environmental statute. Therefore, we hold that a NEPA challenge to the issuance of an oil and gas lease on federal forest land without prior preparation of an EIS is not subject to the ninety-day statute of limitations found in the MLLA.

NEPA itself does not contain a statute of limitations. Thus, timeliness challenges to NEPA actions have routinely involved analysis under the doctrine of laches. The district court in this case invoked this doctrine as the second ground for holding this action barred.

■ An environmental action may be barred by the equitable defense of laches if (1) there has been unreasonable delay in bringing suit, and (2) the party asserting the defense has been prejudiced by the delay. *Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1338 (10th Cir.1982). The district court found that plaintiffs were aware of the lease issuance without preparation of an EIS no later than the fall of 1983 and that their delay in filing suit until May of 1985 was unreasonable. It also found that the approximately $1 million spent on both EIS preparation and other preparatory measures for the North Fork Well drilling constituted sufficient prejudice to warrant application of the bar of laches. Plaintiffs now claim that their decision to wait until BLM acted on the APD to challenge issuance of the lease should not be subject to laches.

Nearly every circuit, including this one, and numerous district courts have recognized the salutary principle that "[l]aches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy." *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982); *see also Jicarilla Apache Tribe,* 687 F.2d at 1337–38; *Concerned Citizens on I–190 v. Secretary of Transp.,* 641 F.2d 1, 7–8 (1st Cir.1981); *Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774, 779–80 (9th Cir. 1980); *Save our Wetlands, Inc. v. United States Army Corps of Eng'rs,* 549 F.2d 1021, 1026 (5th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *City of Rochester v. United States Postal Serv.,* 541 F.2d 967, 977 (2d Cir.1976); *Minnesota Pub. Interest Research Group v. Butz,* 498 F.2d 1314, 1324 (8th Cir.1974); *Environmental Defense Fund v. Tennessee Valley Auth.,* 468 F.2d 1164, 1182–83 (6th Cir.1972); *Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1329–30 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Watersheds Assocs. Rescue v. Alexander,* 586 F.Supp. 978, 984 (D.Neb.1982); *Citizens Comm. Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 526 (S.D.Ohio 1982); *Dalsis v. Hills,* 424 F.Supp. 784, 789 (W.D.N.Y.1976); *Save Our Wetlands, Inc. v. Rush,* 424 F.Supp. 354, 355 (E.D.La. 1976).

■ The application of laches involves a discretionary decision of the district court. *Jicarilla Apache Tribe,* 687 F.2d at 1338. Thus, we review to determine whether the district court has abused its discretion in invoking the doctrine of laches. In environmental litigation one measure of abuse of discretion is whether the district court recognized that laches must be invoked sparingly in order to facilitate Congress's environmental policy. The opinion of the district court in this case fails to consider the legal standard disfavoring laches. This failure amounts to an abuse of discretion. The application of laches involves a discretionary decision of the district court, but that discretion is confined by established standards. Although failure to apply the correct legal standard could be the basis for remand to the district court, we have found that remand is not necessary where there is no

dispute regarding the underlying facts and where it is in the interest of judicial economy and efficiency to decide a matter. *See Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 923 n. 2 (10th Cir.1986). The parties to this dispute disagree only as to the proper characterization of the plaintiffs' activities prior to the institution of this suit. Further, our disposition of the other issues in this appeal renders it unnecessary for us to rely on the laches issue.

This court has held that the "[m]ere lapse of time does not amount to laches." *Jicarilla Apache Tribe,* 687 F.2d at 1338 (citation omitted). The delay must be "unreasonable." The district court found plaintiffs' delay to be unreasonable, because they "were so convinced that the APD would never be granted that they decided to sit on the lease EIS issue until after the decision on the APD." *Park County Resource Council, Inc.,* 613 F.Supp. at 1186.

■ We do not perceive the sinister motive or dilatory tactics apparently seen by the district court in plaintiffs' conscious decision to initially concentrate their energies and resources on participating in the EIS preparation for the North Fork Well drilling, believing APD approval would be unlikely based on their view that the EIS was inadequate. Their tactical decision to fight the APD rather than the lease issuance, because it appeared to be the most efficient way to press their substantive objectives, standing alone, raises no implication of bad faith. The general public, whose interests plaintiffs essentially represent in environmental cases, should not be penalized for plaintiffs' decision to pursue the avenue that they thought to be most fruitful in vindicating their concerns.

"The defense of laches is bottomed on the principle that equity aids the vigilant, not those who sleep on their rights." *Dalsis,* 424 F.Supp. at 788. The nearly two-year delay in challenging the lease issuance in this case was not due to a lack of vigilance; rather, plaintiffs expected that their strategic decision to focus on the APD approval would render challenge to the underlying lease issuance superfluous. Their strategy proved to be ill-destined, but we should not chastise their efforts to selectively minimize litigation. Otherwise, we discourage such thoughtful preparation and encourage rote litigation at the time of every agency action, even though successful challenge of only one action in the series would result in obtaining the benefits sought.

We also fail to agree that the prejudice prong was sufficiently satisfied. The $1 million expense cited by the district court as constituting adequate prejudice relates primarily to preparation of the EIS for APD approval as well as other drilling expenditures—costs that would have been incurred whether the district court ordered preparation of an additional EIS with respect to the lease issuance itself or not. Any increased costs from delay in drilling while an EIS is being prepared on the lease issuance is not sufficient to establish prejudice, because NEPA contemplates just such a delay. *Preservation Coalition, Inc.,* 667 F.2d at 855; *Coalition for Canyon Preservation,* 632 F.2d at 780.

Furthermore, even if pertinent, the expenditures here may not satisfy the prejudice test. Although $1 million seems to most an exorbitant amount, such expenditure has been held insufficient to establish prejudice. *See id.; Watershed Assocs. Rescue,* 586 F.Supp. at 985–86. Rather than absolute dollars already spent, the more salient inquiry explores what percentage of total costs has already been committed. The record is completely void of any such projection.

Moreover, and more important, this is not a case where the project is so substantially completed that significant environmental effects are irreversible, even if an EIS would now be ordered on the lease issuance. *See id.* at 986. We assume that reclamation of the North Fork Well site has mitigated any substantial environmental effects thus far proceeding from the lease issuance. Further drilling under the lease has not yet transpired. In most of the cases in which laches has been applied in the NEPA context, the project allegedly significantly affecting the quality of the human environment was nearly completed,

rendering preparation of an EIS redundant. *See, e.g., Ogunquit Village Corp.,* 553 F.2d at 245 (project completed); *Save Our Wetlands, Inc.,* 549 F.2d at 1028 ($26 million expended and large portions of project substantially completed); *Shiffler v. Schlesinger,* 548 F.2d 96, 104 (3d Cir.1977) (project 85 to 90% complete and irreversible commitment of secondary resources found); *Township of Parsippany-Troy Hills v. Costle,* 503 F.Supp. 314, 320 (D.N.J.1979) (project 80% completed), *aff'd,* 639 F.2d 776 (3d Cir.1980); *Michigan v. City of Allen Park,* 501 F.Supp. 1007, 1017 (E.D.Mich. 1980) (project 80% completed), *aff'd,* 667 F.2d 1028 (6th Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982). Furthermore, even substantial completion has not barred some suits. *See, e.g., City of Davis v. Coleman,* 521 F.2d 661, 670 n. 11, 677–78 (9th Cir.1975) (project 50% completed, yet laches held inapplicable). While technically the "federal action" we are examining—lease issuance—is completed in this case, preparation of an EIS at this point in time could still reasonably be expected to ameliorate any feared environmental harm emanating from the lease issuance. For example, additional and more tailored lease stipulations might be devised in light of the more probing information found in an EIS as opposed to an EA.

In short, having concluded there is neither unreasonable delay nor sufficient prejudice, we hold that the defense of laches does not bar plaintiffs' claim contesting the lease issuance without preparation of an EIS.

■ Finally, the district court held the present action barred for failure to exhaust administrative remedies. Plaintiffs did not, as they may have if they so chose, appeal the lease issuance to the Interior Board of Land Appeals within thirty days under 43 C.F.R. §§ 4.410–.411 (1986). Whether to apply the exhaustion doctrine is a matter within the trial court's discretion, *Rocky Mountain Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 743 n. 12 (10th Cir.1982), but we hold that the trial court abused its discretion in applying the doctrine on the present facts.

■ In *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the Supreme Court articulated several rationales supporting the exhaustion doctrine, including (1) avoidance of premature interruption of the administrative process, (2) deference to bodies possessing expertise in areas outside the conventional experience of judges, (3) recognition of executive and administrative autonomy, and (4) development of a factual record. *Id.* at 193–94, 89 S.Ct. at 1662–63. When these interests would not be promoted by application of the exhaustion doctrine, it is error to indiscriminately dismiss in its name. "The doctrine of exhaustion of administrative remedies has some flexibility depending on the circumstances." *Jette v. Bergland,* 579 F.2d 59, 62 (10th Cir.1978) (district court's dismissal of NEPA claim under exhaustion doctrine that EIS should have been prepared prior to Exxon's exploration for copper deposits reversed); *see also City of Irving v. FAA,* 539 F.Supp. 17, 34 (N.D.Tex.1981) (challenge to failure of agency to furnish EIS not subject to dismissal on ground of failure to exhaust administrative remedies).

■ Dismissal here did not avoid *interruption* of the administrative process; there was no administrative process available to plaintiffs at the time of dismissal. Exhaustion doctrine presupposes an adequate administrative remedy. Neither the IBLA nor any other administrative forum was available to plaintiffs at the time of suit. Just as we should not penalize plaintiffs' strategy decision to contest the APD approval rather than the lease issuance by applying the doctrine of laches to bar this environmental claim, neither should we foreclose plaintiffs from having any forum to litigate their claim because that *same* strategy decision resulted in no appeal to the IBLA within thirty days of lease issuance. This circuit has held that the improbability of obtaining adequate relief by pursuing administrative remedies justifies dispensing with the exhaustion requirement. *New Mexico Ass'n for Retarded Citizens v. New Mexico,* 678 F.2d 847, 850 (10th Cir.1982).

Furthermore, deference to agency expertise is inapplicable in the NEPA context. The deference envisioned under this rationale is appropriate when the disputed issue is one expressly delegated to an agency that deals exclusively with the area and so has refined an expertise in its nuances. *All* federal agencies are required under NEPA to prepare an EIS if a proposed action meets the statutory criteria. No single agency has expertise in determining whether an EIS is statutorily mandated in a given instance. NEPA *imposes* duties on agencies; agencies do not exist to administer NEPA. Hence, courts are equally well-suited to examine the issue of whether a proposed action is a major federal action significantly affecting the environment.

Because ensurance of NEPA compliance is not within the special province of administrative agencies, executive and administrative autonomy and development of a factual record are likewise irrelevant considerations under NEPA. Simply put, the *McKart* factors apply in the prototypical case of an agency issuing an order within its delegated area of expertise that a potential plaintiff would rather dispute in the court system than with the particular agency.[3] Whether an agency needs to draft an EIS before pursuing a proposed action is unlike other administrative decisions. We are reticent to apply the traditional exhaustion doctrine to this untraditional administrative decision when the underlying goals which prompted the doctrine's development would not be served thereby. Therefore, we hold that the district court erred when it ruled that the present action was barred under the exhaustion doctrine.

### B.

We now reach the merits of plaintiffs' contention that BLM was required to prepare a comprehensive EIS prior to the is-

suance of this oil and gas lease of national forest land, because issuance of such a lease always constitutes a major federal action significantly affecting the quality of the human environment under NEPA. The district court held that BLM's publication of a FONSI with regard to lease issuance itself—not possible future drilling under it—was not arbitrary, capricious, or unreasonable. We do not approach this issue with a clean slate. A well-developed body of case law under NEPA, as well as considerations of public policy, must guide our analysis.

It is the stated public policy of the United States to make public lands, including national forest land, available for mineral leasing in an effort to reduce our energy dependence on foreign sources and to protect our national security. This policy is reflected in such legislation as the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1784 (1982) and the Mineral Lands Leasing Act, discussed earlier, as well as section 100 of the Energy Security Act of 1979, 42 U.S.C. § 8701(b)(1), explicitly establishing a national policy to end dependence on foreign energy sources.

NEPA, too, reflects an important public policy of this nation: the avoidance of precipitous federal decision making at the agency level which may fail to adequately consider the environmental ramifications of agency actions. Although labeled an "environmental" statute, NEPA is in essence a *procedural* statute; it does "not require agencies to elevate environmental concerns over other appropriate considerations." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). NEPA requires only that an agency take a "hard look" at the environmental consequences of any major federal action. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576

---

**3.** The only case cited by the district court in supporting its holding fits within this traditional mold. In *Winkler v. Texoma Prod. Co.*, 758 F.2d 1360 (10th Cir.1985) (per curiam), plaintiff's action to quiet title to several oil and gas leases was dismissed for failure to exhaust administrative remedies. BLM notified plaintiff by letter that the leases were improperly issued and sub-

stituted another titleholder in its records. Rather than pursue an administrative appeal, plaintiff applied to the courts. Because the issue of legal title to federal oil and gas leases is squarely within BLM's duties and expertise, dismissal under the exhaustion doctrine was appropriate. However, *Winkler* does not compel the same result in this case.

(1976). NEPA was designed "to insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Thus, the hybrid goal for this nation is to encourage the development of domestic oil and gas production while at the same time ensuring that such development is undertaken with an eye toward environmental concerns.

This informed decision-making process is realized through the preparation and publication of an EIS if any agency action is determined to be a "major" one "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). It is the agency's responsibility to initially determine the need for an EIS. *City of Aurora v. Hunt,* 749 F.2d 1457, 1468 (10th Cir.1984). Regulations require that "[i]n determining whether to prepare an environmental impact statement the Federal agency shall ... prepare an environmental assessment...." 40 C.F.R. § 1501.4(b) (1986). "An EA allows the agency to consider environmental concerns, while reserving agency resources to prepare full EIS's for appropriate cases. If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary." *Sierra Club v. United States Dep't of Transp.,* 753 F.2d 120, 126 (D.C. Cir.1985).

In this case, BLM prepared an EA exceeding 100 pages and evaluating the issuance of federal oil and gas leases in the Rocky Mountain region national forests. Based on this EA, BLM determined that, with appropriate lease stipulations aimed at protecting the environment, lease issuance itself, essentially a paper transaction, does not usually require prior preparation of an EIS. In such a case, our role as a reviewing court is to examine whether the agency's conclusion that its actions will have no significant environmental consequences was a reasonable one.[4] *City of Aurora,* 749 F.2d at 1468; *Brandon v. Pierce,* 725 F.2d 555, 563 (10th Cir.1984). We may not "interject [ourselves] within the area of· discretion of the executive as to the choice of the action to be taken." *Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 (citation omitted). Moreover, the party challenging the agency's decision shoulders the burden of establishing that the FONSI was unreasonable. *Vieux Carre Property Owners, Residents & Assoc., Inc.,* 719 F.2d at 1279; *Township of Lower Alloways Creek,* 687 F.2d at 743. Finally, in deciding whether the agency's decision was reasonable, we must consider such mitigating measures as the lease stipulations imposed in this case so as to avoid untoward environmental consequences. *See Jones,* 792 F.2d at 829 ("conditions mitigating the environmental consequences of an action may justify an agency's decision not to prepare an environmental impact statement"); *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985) (mitigation measures may be considered and need not completely compensate for

---

4. There is a notable split in the circuits as to the appropriate standard of review in evaluating whether an agency's determination to forego an EIS should be overturned. The Tenth aligns itself with the Third, Fifth, Eighth, and Ninth Circuits in adhering to a reasonableness standard. *See, e.g., Jones,* 792 F.2d at 827; *Vieux Carre Property Owners, Residents & Assoc., Inc. v. Pierce,* 719 F.2d 1272, 1279 (5th Cir.1983); *Township of Lower Alloways Creek v. Public Serv. Elec. & Gas Co.,* 687 F.2d 732, 742 (3d Cir.1982) (dicta); *Winnebago Tribe v. Ray,* 621 F.2d 269, 271 (8th Cir.), *cert. denied,* 449 U.S. 836 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). The First, Second, Fourth, and Seventh Circuits, on the other hand, subscribe to the standard articulated in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982): "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See, e.g., City of Alexandria v. Federal Highway Admin.,* 756 F.2d 1014, 1017 (4th Cir.1985); *City of West Chicago v. United States Nuclear Regulatory Comm'n,* 701 F.2d 632, 651 (7th Cir.1983); *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980); *Cross-Sound Ferry Servs., Inc. v. United States,* 573 F.2d 725, 732 (2d Cir.1978).

The Supreme Court has thus far declined to settle the dispute. *See Gee v. Boyd,* 471 U.S. 1058, 105 S.Ct. 2123, 85 L.Ed.2d 487 (1985) (White, Brennan & Marshall, JJ., dissenting from denial of certiorari). Until the Court chooses to take the matter up, we perceive no reason to suggest *en banc* hearing to consider departure from our prior precedent.

adverse environmental impacts for decision to forego EIS to be reasonable); *Louisiana v. Lee,* 758 F.2d 1081, 1083 (5th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986); *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1373 (10th Cir.1980) (comprehensive environmental protection measures in lease found "quite significant and compelling in relation to compliance with the mandates of NEPA").

■ We hold that plaintiffs failed to meet their burden, that BLM took the requisite "hard look" at the environmental consequences of oil and gas leasing, and that the FONSI was "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co.,* 462 U.S. at 105, 103 S.Ct. at 2256. The oil and gas lease, by itself, does not cause a change in the physical environment. In order to work the lease, the lessee must submit site-specific proposals to the Forest Service and BLM who can then modify those plans to address any number of environmental considerations. Each action is subject to continuing NEPA review.

The issuance of the oil and gas lease in this case is analogous to the issuance of the mineral patent in *South Dakota v. Andrus,* 614 F.2d 1190 (8th Cir.), *cert. denied,* 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). The Eighth Circuit there held that no EIS was required before issuance of the patent, because "the granting of a mineral patent does not enable the private party ... to do anything." *Id.* at 1194. While the court recognized that the proposed mining project was substantial and noted the probable need for an EIS along the way, an EIS was not required during the "germination process of a potential proposal." *Id.* at 1195 (quoting *Kleppe,* 427 U.S. at 401 n. 12, 96 S.Ct. at 2726 n. 12).

Even more compelling are the facts and conclusion found in *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C. Cir.1982). The Forest Service there approved actual exploratory mineral *drilling* in the Cabinet Mountains Wilderness Area in Northwestern Montana without the preparation of an EIS. Thirty-six drill holes in twenty-two sites for *each* of four consecutive years were proposed and approved on the basis of an EA after stringent mitigating measures were imposed to offset the adverse effects of the drilling activities. We need not indicate any approval of such an extreme set of facts to decide the case before us; we cite that case only by way of contrast to the facts before us. In the present case, we are dealing not with wilderness area but with multiple-use land, and an EIS *was* prepared prior to the exploratory drilling at the North Fork Well.

Moreover, we do not agree that our prior precedent in *Davis v. Morton,* 469 F.2d 593 (10th Cir.1972), dictates a contrary conclusion. The major issue in that case was whether the lease of Indian land to a corporation constituted a "federal" action, triggering NEPA. We held that it did and therefore an EIS was required. However, in that case, there were firm plans to develop the land subject to the lease. A small city with 15,000 residents was envisioned. The underlying project was well articulated—unlike the prototypical oil and gas lease. *See infra. Davis* does not stand for the proposition that an EIS is required *whenever* the Federal Government leases land.

The plaintiffs argue that an EIS must be prepared at the leasing stage because of the eventual cumulative and foreseeable effects of exploratory drilling and then full field development. Such effects, they argue, must be considered at the leasing stage, else they can never be adequately considered and addressed. We concede that " '[s]egmentation of a large or cumulative project into smaller components in order to avoid designating the project a major federal action has been held to be unlawful.' " *National Wildlife Fed'n v. Appalachian Regional Comm'n,* 677 F.2d 883, 890 (D.C.Cir.1981) (quoting *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 240 (3d Cir. 1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981)); *see also City of West Chicago,* 701 F.2d at 650 ("piecemealing" allows agency to evade NEPA requirements "by segmenting an overall

plan into smaller parts involving action with less significant environmental effects").

This argument would have more force in this context if full field development were likely to occur and could be specifically described at the leasing stage. The paradigmatic oil and gas lease, however, does not fall into such a category. Full field development is typically an extremely tentative possibility at best at the leasing stage. Because "exploration activities are conducted on only about one of ten federal leases issued and development activities are conducted on only one of ten of those leases on which exploration activities have been approved and completed," Intervenors' Answer Brief at 45–46, the steps from leasing to full field development are not "so interdependent that it would be unwise or irrational to complete one without the others"—the benchmark signaling the need for a cumulative impact EIS. *Webb v. Gorsuch,* 699 F.2d 157, 161 (4th Cir.1983) (citing *Sierra Club v. Froehlike,* 534 F.2d 1289, 1297–99 (8th Cir.1976) and *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir.1974)). To require a cumulative EIS contemplating full field development at the leasing stage would thus result in a gross misallocation of resources, "would trivialize NEPA and would 'diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.'" *Cabinet Mountains Wilderness,* 685 F.2d at 682 (quoting *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1003 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 274, 63 L.Ed.2d 599 (1980)). NEPA's goal is not to generate paperwork evaluating speculative possibilities that the odds favor will never occur. "[A]n EIS need not be prepared simply because a project is *contemplated,* but only when the project is *proposed." Weinberger v. Catholic Action,* 454 U.S. 139, 146, 102 S.Ct. 197, 203, 70 L.Ed.2d 298 (1981) (emphasis in original).

This is not to say that drilling or development at a single site will never require an overall assessment. On the contrary, an APD for a specific site may trigger the need for a broader-based EIS, evaluating both the past and future environmental effects of the site-specific drilling, as well as the regional cumulative effects of drilling a particular site in light of other regional development. The regulations define "cumulative impact" as

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (1986). As an overall regional pattern or plan evolves, the region-wide ramifications of development will need to be considered at some point. A singular, site-specific APD, one in a line that prior to that time did not prompt such a broad-based evaluation, will trigger that necessary inquiry as plans solidify. We merely hold that, in this case, developmental plans were not concrete enough at the leasing stage to require such an inquiry.

Pragmatic considerations as well as more informed environmental decision making under NEPA dictate our result. During fiscal year 1984, the last year for which published information is available, the United States issued 5,478 oil and gas leases. "The entire Department of the Interior, comprised not only of the oil and gas section of the BLM, but also other BLM divisions and a handful of other agencies such as the Office of Surface Mining, the Bureau of Indian Affairs, the National Park Service, and the Fish and Wildlife Service, prepared only 115 EISs during 1984," only about two percent of the EISs that would be required were we to hold that preparation of a comprehensive EIS is mandatory prior to every oil and gas lease issuance. Intervenor's Answer Brief at 44–45. The expenditure in terms of tax dollars, manpower, and time involved in preparing an EIS is substantial. *Cf. supra* note 2 and accompanying text. Of course, such considerations are not dispositive of the legal

requirements under NEPA. They do, however, become persuasive when one considers that the boilerplate EIS that would likely result in the absence of site-specific proposals at the leasing stage would not measurably improve the decision-making process.

The tiered approach to environmental review, generally condoned in the regulations, *see* 40 C.F.R. §§ 1502.20, 1508.28 (1986), is calculated to provide the most informed decision making possible in oil and gas leasing. When BLM is considering a mere leasing proposal, it has no idea whether development activities will ever occur, let alone where they might occur in the lease area. When an APD is submitted, BLM then has a concrete, site-specific proposal before it and a more useful environmental appraisal can be undertaken. Only then can BLM determine whether a river system is implicated, where access will be needed and how it should be accomplished, and which wildlife is affected. In short, the specificity that NEPA requires is simply not possible absent concrete proposals.

In this circuit, a rational basis test is applicable in determining whether the time is ripe for an EIS that eventually will clearly be required.[5] *Colorado River Water Conservation Dist. v. United States*, 593 F.2d 907, 909 (10th Cir.1977). "Certainly the project must be of sufficient definiteness before an evaluation of its environmental impact can be made and alternatives proposed." *Id.* at 910 (quoting *Upper Pecos Ass'n v. Stans*, 452 F.2d 1233, 1237 (10th Cir.1971), *vacated on other grounds,*

409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972)). To require a cumulative EIS at the leasing stage in this particular case would be tantamount to "demanding that the Department specify the probable route of a highway that may never be built from points as yet unknown to other points as yet unknown over terrain as yet uncharted in conformity with state plans as yet undrafted. A more speculative exercise can hardly be imagined." *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1379 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Because only one of ten leases results in any development, "the additional information would at best amount to speculation as to future event or events [and] obviously would not be of much use as input in deciding whether to proceed." *Id.* at 1378.

Therefore, in light of the substantial EA, of the mitigating lease restrictions requiring further environmental appraisal before any surface disturbing activities commence, of the nebulousness of future drilling activity at the time of leasing, and of the continuing supervision of the federal agencies involved over future activities, the agency's decision in this case that the lease issuance itself was not a major federal action significantly affecting the quality of the human environment was not unreasonable. Furthermore, there clearly was a rational basis to defer preparation of an EIS until a more concrete proposal was submitted to BLM.

The inquiry with respect to an oil and gas lease does not fall indisputably within one category rather than the other. If no exploration under the lease is ever pursued, determining whether an EIS is required at the lease issuance stage falls within the first category. If oil or gas is found and development undertaken, an EIS is clearly required, and determining whether that EIS should issue at the leasing stage becomes merely a timing question. The difficulty in oil and gas leasing, of course, is that one cannot predict which path will eventually be taken at the leasing stage. We have thus considered both possibilities herein and conclude that in neither context is an EIS required at the leasing stage absent firm plans to develop.

---

5. There is a subtle, but significant, distinction between reviewing an agency's determination that its action does not constitute a major federal action significantly affecting the quality of the human environment, thus dispensing with the need for an EIS, and reviewing an agency's timing decision with respect to preparation of an EIS admittedly required because the overall project concededly does comprise an action subject to NEPA. The former case requires the more stringent "reasonableness" standard of review, because federal action may forever escape environmental scrutiny. The latter scenario justifies the lower "rational basis" scrutiny because of the assurance that the environmental consequences of an action will enter the decision-making process at some point; merely the timing is at issue.

The district court's denial of a preliminary injunction and its order dismissing this suit are both AFFIRMED.